==========================================================

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

AARON SALTER,

*Plaintiff-Appellee,*

-vs-

DONALD OLSEN,

*Defendant-Appellant,*

*and*

CITY OF DETROIT, MI,

*Defendant.*

On Appeal from the United States District Court for
the Eastern District of Michigan Southern Division

_____

## PLAINTIFF-APPELLEE'S BRIEF ON APPEAL

_____

MARK GRANZOTTO, P.C.

MARK GRANZOTTO
Attorney for Plaintiff-Appellee
2684 Eleven Mile Road, Suite 100
Berkley, Michigan 48072
(248) 546-4649

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**(This statement should be placed immediately preceding the statement of issues contained in the brief of the party.  See enclosed copy of the 6th Cir. R. 25.)**

Aaron Salter,

      Plaintiff-Appellee,                  Case No. 23-1365

-vs-

Donald Olsen,

      Defendant-Appellant.

_____/

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 25, Mark Granzotto makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  __**NO**__
     If the answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

2.     Is there publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  __**NO**__
     If the answer is YES, list the identity of such corporation and the nature of the financial interest:

  __/s/  Mark Granzotto_____       __February 9, 2024__
  (Signature of Counsel)                      (Date)

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS
  AND FINANCIAL INTEREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT. . . . . . . . . . . . . . . . .  viii

STATEMENT OF THE ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . .  ix

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      I.      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      II.     THERE IS NO MERIT TO DEFENDANT'S ARGUMENT
              THAT DISMISSAL IS PROPER FOR LACK OF SUBJECT
              MATTER JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      III.    THE DISTRICT COURT PROPERLY DENIED SUMMARY
              JUDGMENT AS TO PLAINTIFF'S CLAIM OF A
              CONSTITUTIONAL VIOLATION FOR DEFENDANT'S
              FAILURE TO DISCLOSE EXCULPATORY EVIDENCE. . . . . . . 25

      IV.    THE DISTRICT COURT PROPERLY DENIED SUMMARY
              JUDGMENT AS TO PLAINTIFF'S CLAIM OF A
              CONSTITUTIONAL VIOLATION FOR DEFENDANT'S
              UNNECESSARILY SUGGESTIVE SINGLE-PHOTO
              IDENTIFICATION PROCEDURE. . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CERTIFICATION PURSUANT TO FRAP 32(a)(7)(C). . . . . . . . . . . . . . . . . . . . 50

DESIGNATION OF RECORD ON APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# INDEX OF AUTHORITIES

**Page**

**Cases**

*Anderson v. City of Blue Ash*,
 798 F.3d 338 (6th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ansari v. Jimenez*,
 No. 20-10719 (E.D. Mich. Oct. 31, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Arizona v. Youngblood*,
 488 U.S. 51 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Barton v. Warden, S. Ohio Corr. Facility*,
 786 F.3d 450 (6th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Berry v. Schmitt*,
 688 F.3d 290 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Berryman v. Rieger*,
 150 F.3d 561 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Boggs v. City of Cleveland*,
 655 F.3d 516 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Brady v. Maryland*,
 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 8

*Buczkowski v. Buczkowski*,
 88 N.W.2d 416 (Mich 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*District of Columbia Court of Appeals v. Feldman*,
 460 U.S. 462 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dodrill v. Ludt*,
 764 F.2d 442 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
    544 U.S. 280 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Foster v. Patrick*,
    806 F.3d 883 (6th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Fowler v. Benson*,
    924 F.3d 247 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gillispie v. Miami Township, Ohio*,
    18 F.4d 909 (6th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gregory v. City of Louisville*,
    444 F.3d 725 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hatchett v. City of Detroit*,
    495 F.Appx 567 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Heck v. Humphrey*,
    512 U.S. 477 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 16

*Jackson v. City of Cleveland*,
    925 F.3d 793 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Johnson v. Jones*,
    515 U.S. 304 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Killian v. United States*,
    368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961) . . . . . . . . . . . . . . . . . 31

*Kyles v. Whitley*,
    514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Martin v. City of Broadview Heights*,
    712 F.3d 951 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Moldowan v. City of Warren*,
    578 F.3d 351 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Perry v. New Hampshire*,
    565 U.S. 228 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Peterson v. Hermes*,
    931 F.3d 546 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Rooker v. Fidelity Trust Co.*,
    263 U.S. 413 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Simmons v. U.S.*,
    390 U.S. 377 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Skatemore, Inc. v. Whitmer*,
    40 F.4th 727 (6th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Smith v. Wayne County*,
    No. 21-12070 (E.D. Mich. Dec. 19, 2023) . . . . . . . . . . . . . . . . . . . . . . 25

*Spurlock v. Satterfield*,
    167 F.3d 995 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Stovall v. Denno*,
    388 U.S. 293 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Strickler v. Greene*,
    527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Johnson*,
　　457 U.S. 537 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## Michigan Court Rules

MCR 6.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

MCR 6.501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

MCR 6.502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

MCR 6.502(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

MCR 7.200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

MCR 7.300 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## Sixth Circuit Rules

6th Cir. R. 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

6th Cir. R. 29(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## Federal Rules

FRAP 32(a)(7)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Other Authorities

28 U.S.C. § 1257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 1738 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellee hereby requests oral argument in this matter. Because of the complexity of the district court factual record and the rationale for the district court's ruling, plaintiff would suggest that the Court might derive some benefit from oral argument.

## STATEMENT OF THE ISSUES PRESENTED

Whether the defendant's jurisdictional argument predicated on the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), which is being raised for the first time on appeal, is lacking in merit.

Whether the district court properly concluded that defendant was not entitled to judgment as a matter of law on Mr. Salter's claim based on defendant's violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

Whether the district court properly concluded that defendant was not entitled to summary judgment on Mr. Salter's claim against defendant based on an unconstitutionally suggestive identification.

## STATEMENT OF THE CASE

In the early morning hours of August 6, 2003, three individuals - Jamar Luster, Kimberly Allen, and Michael Payne - were sitting and drinking on the front porch of a house located on Parkgrove Street in Detroit, Michigan. (RE.1: Complaint, ¶8, PageID#2). Suddenly and without warning, they were ambushed and shot by two men who emerged from the darkness. (*Id.*). A fourth individual, Willie "Taboo" Thomas, who was standing near the porch, was fatally shot. (*Id.*).

At approximately 5:20 a.m. that morning, Donald Olsen, the Detroit Police Department (DPD) officer in charge of the homicide investigation, interviewed one of the shooting victims, Jamar Luster, in a hospital room where he was being treated for his injuries. (*Id.*, ¶9, PageID#3). Mr. Luster identified one of the shooters as "Rob," who "hangs out on Pelkey, 3rd house off [the] corner of Linnhurst on the West Side, [the] only house with a privacy fence." (RE.36-2: Luster/Olsen Statement, PageID#724). Mr. Luster described "Rob" as a black male, 26-27 years old, 5'7", 150-170 pounds, light-brown complexion, thin beard, and low-cut hair. (*Id.*). Mr. Luster further indicated that he had never seen the other shooter, and could only describe the second shooter as "thin firing a gun." (*Id.*, PageID#725).

Mr. Luster also informed Officer Olsen that a man nicknamed "E," who stays on Pelkey Street, had shot up the same house one month earlier and had shot a girl on

Pelkey Street. (*Id.*, PageID#726; RE.36-4: Olsen Dep, at 122, PageID#762).

Mr. Luster gave a second statement to Detroit Police Department Officer Joseph Diabliz at the hospital that morning. (RE.36-3: Luster/Diabliz Statement, PageID#728). Mr. Luster described the first shooter as "Rob," a black male in his 20s, 5'7", thin build, medium complexion, "short afro wearing all black." (*Id.*). Mr. Luster indicated that "Rob" was known to frequent the area of Pelkey/Linnhurst and known to drive a "beat up" peach Cutlass. (*Id.*). Mr. Luster described the second shooter as a black male in his 20s, 6'0", thin build, white t-shirt, "N.O.D. [no other description]." (*Id.*).

There is no dispute that Aaron Salter, the plaintiff in this action, at the time of the August 6, 2003 shooting was approximately 6'4" tall and weighed 250 pounds. (RE.1: Complaint, ¶12, PageID#3).

At 8:15 a.m. on August 6, 2003, after Mr. Luster was discharged from the hospital, Officer Olsen visited Mr. Luster at his home.  Based only on what he described as a "hunch" after "doing some research at the precinct," Officer Olsen brought a single photograph of Mr. Salter, with the identification code CB #57003933, to Mr. Luster's house and showed it to him. (RE.36-5: Olsen Preliminary Exam, at 29-30, PageID#771-772). When Officer Olsen asked Mr. Luster if he recognized the person in the photograph as "Rob," Mr. Luster answered in the

affirmative. (RE.36-6: Luster Statement, PageID#774).

After showing Mr. Luster the single photograph of Mr. Salter, Officer Olsen showed Mr. Luster an array of 6 photographs. (R:36-10: Photo Array, PageID#833; RE.36-5: Olsen Preliminary Exam, at 28-29, PageID#770-771; RE.36-7: Luster Dep, at 37-38, 64-67, PageID#786, 792-793). Mr. Salter's photograph was not included in this photo array. (R:36-10: Photo Array, PageID#833; RE.36-5: Olsen Preliminary Exam, at 29, PageID#771). According to Officer Olsen, the photo array shown to Mr. Luster was not related to this shooting but was instead relevant to "something else" that occurred in that neighborhood that he was investigating in conjunction with this shooting. (RE.36-12: Olsen Trial Testimony, at 57-58, 61, PageID#895-896, 899).

Based solely on Mr. Luster's identification of Mr. Salter from the single photograph, Officer Olsen sought a warrant for Mr. Salter's arrest. (RE.36-4: Olsen Dep., at 65-66, PageID#748; RE.29-9: Investigator's Report, PageID#466). Mr. Salter was arrested and charged with first degree murder, two counts of assault with intent to murder, and felony firearm. (RE.1: Complaint, at 8, PageID#8).

At Mr. Salter's preliminary examination held in September 2003, Mr. Luster testified that there were two shooters involved in August 6, 2003 incident, and that Mr. Salter looked like the tall shooter with the long gun. (RE.36-9: Luster Preliminary Exam, at 7-9, 20-21, PageID#812-814, 825-826). Mr. Luster indicated that the

shooters were approximately 35 to 40 feet away and it was dark, but he saw the shooters under a streetlight. (*Id.*, at 9, 16-17, PageID#814, 821-822). Mr. Luster testified that he recognized Mr. Salter from a confrontation that occurred earlier in the day of the shooting, and that he identified Mr. Salter "and the other guy, Rob, or whatever" from photographs shown to him by the police. (*Id.*, at 13-17, 21-25, PageID#818-822, 826-830).

The charges against Mr. Salter proceeded to trial in December 2003 where he was represented by an attorney, Lyle Harris. At that trial, Mr. Luster testified that he picked out *three* individuals whom he believed looked like the shooters from the photographs shown to him by Officer Olsen. (RE.36-11: Luster Trial Testimony, at 241-249, 256, 259, PageID#859-867, 873, 877). Mr. Luster admitted at the trial that, although he signed a statement identifying Mr. Salter as "Rob," that was a "mistake" because he did not in fact identify Mr. Salter as "Rob" because "Rob is way smaller than [Mr. Salter]." (*Id.*, at 246-256, 269, PageID#864-874, 887). Mr. Luster maintained, however, in his trial testimony that Mr. Salter was one of the men involved in the August 6, 2003 shooting. (*Id.*, at 220-223, PageID#838-841).

Conversely, Officer Olsen testified at both the preliminary examination and at trial that Mr. Luster identified Mr. Salter as one of the shooters from the single photograph shown to him. (RE.36-5: Olsen Preliminary Exam, at 27-29, PageID#769-

771; RE.36-12: Olsen Trial Testimony, at 56-58, 63-65, PageID#894-896, 901-903).

Officer Olsen denied that Mr. Luster identified any of the individuals depicted in the photo array as having any connection to the shooting. (*Id.*). Officer Olsen further acknowledged that he could have prepared a photo array with Mr. Salter's photograph in it, but did not do so here. (RE.36-5: Olsen Preliminary Exam, at 29, PageID#771; RE.36-12: Olsen Trial Testimony, at 63-64, PageID#901-902).

On December 8, 2003, Mr. Salter was convicted of one count of first-degree murder, two counts of assault with intent to murder, and one count of felony firearm. (RE.1: Complaint, ¶37, PageID#8). He was sentenced to life in prison without the possibility of parole. (*Id.*, at ¶38, PageID#9).

After years of denials of his appeals in state and federal courts, Mr. Salter's appeals were sent to Jonathon Epstein and Loren Khogali, and later to Colleen Fitzharris, of the Federal Defender Office. (*Id.*, at ¶44, PageID#10).

In early 2018, shortly after the Wayne County Prosecutor's Office formed the Conviction Integrity Unit ("CIU"), headed by attorney Valerie Newman, the CIU began investigating Mr. Salter's claims of innocence. (*Id.*, at ¶45, PageID#11). The CIU, with the help of Mr. Salter's lawyers from the Federal Defender Office in Detroit, discovered new evidence that had not been revealed to the prosecutor or to the attorney who represented Mr. Salter at trial, Lyle Harris. (*Id.*).

One piece of new evidence in the police file was a closeup photograph of Earland "E" Collins that was not turned over to the defense during Mr. Salter's prosecution. (RE.36-13: Earland Photo, PageID#910). The photograph and accompanying piece of paper indicated "'E' Earland, tall dark-skinned. Pelkey/Linnhurst. 3 houses off corner Moross on Peerless." (*Id.*). An Offender Tracking Information System ("O.T.I.S.") description of Earland Collins describes him as 6'2", 200 pounds. (RE.36-14: O.T.I.S., PageID#912).

The closeup photograph, which was discovered fifteen years later by CIU investigator Patricia Little, was not turned over to the defense because it was never provided to the prosecutor. (RE.36-15: Harris Affidavit, PageID#914; RE.36-16: Lindsay Dep, 27-28, PageID#924). Colleen Fitzharris, one of Mr. Salter's attorneys from the Federal Defender Office, received Lyle Harris' file as part of her appellate investigation. (RE.36-17: Fitzharris Affidavit, ¶3, PageID#927). Ms. Fitzharris attested that the photograph of Earland Collins was not part of Mr. Harris' file. (*Id.*, at ¶6).

The CIU investigators interviewed Officer Olsen as part of their investigation. (RE.36-18: Olsen Interview, PageID#930-931). Officer Olsen admitted that he believed the case against Mr. Salter was weak. (*Id.*). Officer Olsen's overall impression of the case is that "[t]he case stinks. It always stunk," and of all the cases

he handled in the Homicide Unit between 2002 to 2016, "this case 'stunk the worst.'" (*Id.*).

As a result of the CIU investigation and newly-discovered evidence, Mr. Salter's criminal convictions and sentences were vacated and all criminal charges against him were dismissed on August 15, 2018. (RE.1: Complaint, ¶46, PageID#11; RE.36-22: Stipulated Order Vacating Convictions, PageID#970-971). The order was signed by the Judge Annette J. Berry, the same judge who presided over Mr. Salter's 2003 criminal trial. (*Id.*). The order provides that newly discovered evidence and the Wayne County Prosecutor's own investigation "warrants relief" and the court was therefore vacating the convictions "in the interests of justice":

> This matter having been presented in open court through the stipulation of the parties, and the parties having agreed that newly discovered evidence, as well as the Wayne County Prosecutor's own investigation, warrants relief, and the Court being otherwise fully advised in the premises of said stipulation;
>
> IT IS HEREBY ORDERED that in the interests of justice, Mr. Salter's convictions and sentences in this matter are hereby vacated, and all related charges are hereby dismissed. Mr. Salter shall be released from the Michigan Department of Corrections forthwith.

*(Id.*, at 2; PageID#971). Valerie Newman, the Director of the CIU, Carole Stanyar, an assistant Wayne County prosecutor in the CIU, and two attorneys from the Federal Defender Office, Colleen Fitzharris and Jonathan Epstein, all stipulated to entry of

Judge Berry's order vacating Mr. Salter's conviction. (*Id.*). As a result of his vacated conviction, Mr. Salter was released from prison on August 15, 2018, his 36th birthday, after spending nearly 15 years in prison. (RE.1: Complaint, ¶¶48-49, PageID#11-12).

Mr. Salter filed a complaint on March 2, 2020 in the United States District Court for the Eastern District of Michigan, alleging that Officer Olsen violated his constitutional rights. (RE.1: Complaint, PageID#1-19).[1] He alleged Fourth Amendment violations for fabrication of evidence, false arrest, and malicious prosecution, and he alleged Fifth Amendment violations for withholding exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963) and for an unduly suggestive identification. (*Id.*). Mr. Salter also alleged a claim of malicious prosecution under Michigan law. (*Id.*).

The parties took the depositions of various witnesses during the course of discovery, including Mr. Luster and Officer Olsen. Mr. Luster testified at his deposition that he did not get a good look at the shooters' faces and could only see their figures at the time of the shooting. (RE.36-7: Luster Dep, at 17-19, PageID#781). He confirmed that the shooters were approximately 35 to 40 feet away from him and he indicated that he was only able to see the shooters through a small

---

[1] Plaintiff also named the City of Detroit as a party in the complaint. The district court entered a stipulated order of dismissal of Mr. Salter's claims of liability as to the City of Detroit on April 10, 2019.

opening in a curtain on the porch. (*Id.*; RE.36-19: Photograph of Porch, PageID#933).

Mr. Luster further testified that he informed Officer Olsen that he "pretty much didn't

see" who the shooters were because the shooting occurred at night. (RE.36-7: Luster

Dep, at 36, PageID#785). Mr. Luster only "thought who it might be" based upon

events that had occurred earlier in the day of the shooting, when he "saw some guys

ride through and pretty much I know they faces and know who they was." (*Id.*).

Mr. Luster testified that when Officer Olsen came to his house the morning of

the shooting, Officer Olsen told him that the police had already "picked up a guy on

that street with a rifle" in connection with the shooting. (RE.36-7: Luster Dep, at 90-

91, PageID#799). Only after advising Mr. Luster that they had already "rounded up"

someone in connection with the shooting did Officer Olsen show Mr. Luster the

photograph of Mr. Salter and ask him to confirm if the photograph was the same

person who shot at him. (*Id.*). Mr. Luster then identified Mr. Salter as "Rob" and

informed Officer Olsen that Mr. Salter "looked like the guy" who was shooting at

him. (*Id.*, at 36-38, PageID#785-786). Mr. Luster testified, however, that if he had

known that Mr. Salter was 6'4" and 250 pounds when he was shown the photograph,

he would not have picked him as "Rob" because "he don't fit the description." (*Id.*,

at 42-43, PageID#787, 792-793).

Mr. Luster testified that he later discovered after Mr. Salter's trial and

conviction that Mr. Salter was not the man who shot him. (RE.36-7: Luster Dep, at 86-89, PageID#798-799). Mr. Luster testified that he saw "E," Earland Collins, in a vehicle in the same neighborhood approximately two weeks after Mr. Salter's trial and he determined that "E" was actually the shooter. (*Id.*). Notably, and contrary to the testimony offered by Officer Olsen during Mr. Salter's criminal proceedings, Mr. Luster testified that he had identified "E" in the photo array shown to him by Officer Olsen and informed Officer Olsen at that time that "E" also was one of the shooters. (*Id.*, at 37-38, 79-80, PageID#786, 796).

Officer Olsen testified at deposition that he could not recall how he came to use Mr. Salter's photograph after Mr. Luster indicated that one of the shooters was "Rob." (RE.36-4: Olsen Dep, at 28, 60-61, 74-76, PageID#738, 746-747, 750). Officer Olsen could only say that "we came up with this picture and he [Mr. Salter] got picked out as the person who shot." (*Id.*, at 76, PageID#750). Although Officer Olsen believed at that time that Mr. Salter was the shooter "Rob," he testified that he did not know that Mr. Salter was 6'4" and 250 pounds at the time he showed Mr. Salter's photograph to Mr. Luster. (*Id.*, at 77-80, 85, 123, PageID#751, 753, 762). Officer Olsen admitted that if he had known Mr. Salter's actual height and weight, he would not have shown Mr. Salter's photograph to Mr. Luster because "that doesn't match. He's way too big." (*Id.*, at 85-86, PageID#753). In fact, Officer Olsen

admitted that no reasonable officer would have shown Mr. Salter's photograph to Mr. Luster if the officer knew Mr. Salter was 6'4" and 250 pounds. (*Id.*, at 123, PageID#762).

Officer Olsen also testified at deposition that he could not say why he did not ask additional questions of Mr. Luster regarding "E." (*Id.*, at 73-74, PageID#750). Officer Olsen admitted that, despite Mr. Luster having discussed "E" in his first police statement, he did nothing in terms of investigating "E" because "I went with the identification that he [Mr. Luster] gave us." (*Id.*, at 90-91, 94-96, 122-123, PageID#754-755, 762). Officer Olsen also admitted that had Mr. Luster identified "E" and another individual as possible shooters, that information should have been included in the police file and forwarded to the prosecutor. (*Id.*, at 106-108, PageID#758).

Mr. Salter also took the deposition of John Fennessey, the manager in the department of innovation and technology, public safety IT and cyber security at the Detroit Police Department. (RE.36-8: Fennessey Dep, PageID#802-805). Mr. Fennessey testified that the Department used the LiveScan system in 2003, which is a county-wide electronic fingerprint system. (*Id.*, at 6, PageID#804). Mr. Fennessey confirmed that the LiveScan system would include electronic fingerprints, a mugshot, and demographic information regarding an individual such as race, sex, name, date

of birth, address, height and weight, scars or tattoos, and hairstyle. (*Id.*, at 7-9, PageID#804-805). Mr. Fennessey further confirmed that an officer pulling up a single mugshot would be provided all of that information. (*Id.*, at 10-11, PageID#805).

Mr. Salter also obtained during discovery the Detroit Police Department policies on eyewitness identification and lineups. (RE.36-20: DPD Policy 203.11, PageID#935-939). The Department policies in effect in 2003 provided that witnesses should be shown five or six photographs "including that of the suspect" and directed that "[w]itnesses should never be shown only a photograph of the suspect." (*Id.*, at 1, PageID#935).

After the close of discovery, Officer Olsen filed a motion for summary judgment seeking dismissal of all of Mr. Salter's claims. (RE.29: Motion for Summary judgment, PageID#358-392). He argued in that motion that there was no genuine issue of material fact regarding any of Mr. Salter's claims and, on that basis, that he was entitled to judgment as a matter of law. (*Id.*).

Mr. Salter filed a response to the motion for summary judgment, arguing that there were genuine issue of material fact warranting denial of defendant's motion. (RE.36: Response to Motion, PageID#667-720). Specifically, Mr. Salter argued in relevant part that the single-photo identification process used by Officer Olsen violated his right to Due Process because it was unduly suggestive and unnecessary.

(*Id.*, at 10-19, PageID#691-700). Mr. Salter also argued that the evidence developed in the case established a *Brady* violation due to Officer Olsen's failure to disclose the closeup photograph of Earland "E" Collins and that fact that Mr. Luster had picked out Mr. Collins as a shooter in the photo array. (*Id.*, at 28-38, PageID#709-719). Mr. Salter further argued that his claims of constitutional violations were clearly established as of August 2003, the earliest possible date of Officer Olsen's misconduct. (*Id.*, at 7-10, PageID#688-691).

Along with his response to the motion, Mr. Salter submitted two affidavits in support of his claims. One of these two affidavits was from Lyle Harris, Mr. Salter's criminal defense attorney during his 2003 prosecution, and another from Jamar Luster. (RE.36-15: Harris Affidavit, PageID#914; RE.36-25: Luster Affidavit, PageID#1002). Mr. Harris attested in his affidavit that, if he had been provided the closeup photograph of Earland Collins, it "would have allowed me to cross-examine the lead detective, Donald Olsen, more effectively, as it showed that the police had considered Earland Collins as a suspect." (*Id.*, at ¶8). Mr. Harris further attested that having the photograph of a "stronger suspect" in the detective's files "would have called into question the integrity of the homicide investigation in this case." (*Id.*).

Mr. Luster attested in his affidavit that Earland Collins ("E") was the taller shooter of the two individuals who shot at him and killed Mr. Thomas on August 6,

2003. (RE.36-25: Luster Affidavit, ¶¶1-2, PageID#1002). Mr. Luster further asserted that, had Officer Olsen shown him the closeup photograph of Earland Collins at the time he was shown the photograph of Mr. Salter, "I would have told him that Earland Collins was the taller shooter with a rifle." (*Id.*, ¶4).

The district court heard oral argument on defendant's motion for summary judgment on December 16, 2020. (RE.54: Tr. 12/16/20, PageID#1465-1488). After hearing arguments from both parties, the court took the matter under advisement and indicated it would issue a written ruling. (*Id.*, at 23, PageID#1487).

The district court issued an written opinion and order on June 2, 2022 granting in part and denying in part Officer Olsen's motion for summary judgment. (RE.44: Opinion and Order, PageID#1058-1101). The district court denied summary judgment on Mr. Salter's *Brady* claim and his unduly-suggestive-identification claim, but dismissed all other claims. (*Id.*).

As to Mr. Salter's *Brady* claim, the district court held that Mr. Salter presented sufficient evidence to create a question of fact both as to whether the closeup photograph of Earland Collins was improperly withheld from the defense and whether that photograph was material. (*Id.*, at 27-31, PageID#1082-1088). The district court found that the defense not only did not have the larger photograph of Mr. Collins, but also did not have the "important context provided by Luster's testimony – that he did

identify Collins as one of the shooters from the photo array." (*Id.*, at 30, PageID#1087). The district court further held that, viewed in the light most favorable to Mr. Salter, the evidence supported a reasonable probability that the outcome of the trial would have been different had the larger photograph of Mr. Collins been turned over and had Luster's identification of "E" as one of the shooters been provided to the defense. (*Id.*).

The district court noted that the limited facts that were known to Mr. Salter and his counsel during his criminal proceedings – that Collins was involved in two other shootings – "are simply not the same as the evidence that Luster identified Collins as one of the shooters at the house on Parkgrove Street on the night in question." (*Id.*). The court further noted that Officer Olsen did not dispute that it was clearly established at the time of the events in question that Mr. Salter had a right to not have exculpatory or impeachment evidence withheld from him. (*Id.*, at 31, n.5, PageID#1088).

As to Mr. Salter's unduly-suggestive-identification claim, the district court held that the single-photo identification was unnecessarily suggestive and it determined that questions of fact remained as to whether the evidence was reliable despite the impermissible suggestiveness of the identification procedure. (*Id.*, at 31-44, PageID#1088-1101). The court further held that Officer Olsen was not entitled to

15

qualified immunity because the right to be free from unduly suggestive identification procedures was clearly established at the time Mr. Salter's constitutional rights was violated because "a reasonable officer in 2003 would be on notice that the use of a single-photo identification along with the remarkable discrepancy between the witness's description of the perpetrator and the perpetrator's actual characteristics would be unconstitutional." (*Id.*, at 41-44, PageID#1098-1101).

Defendant filed a motion for reconsideration of the district court's June 2, 2022 opinion and order, arguing that the court committed palpable error in denying summary judgment on all of Mr. Salter's claims. (RE.45: Motion for Reconsideration, PageID#1102-1138).

The district court denied the motion for reconsideration by order entered on July 20, 2022. (RE.51: Order, PageID#1460). The court held that defendant's motion presented the same issues already ruled on by the court and otherwise failed to demonstrate that the court made a mistake in its opinion and order. (*Id.*).

## <u>SUMMARY OF THE ARGUMENT</u>

There is no merit to defendant's argument, made for the first time on appeal, that this Court lacks subject matter jurisdiction over this case. Defendant's attempt to invoke the doctrine of *Heck v. Humphrey*, 512 U.S. 477, 486 (1994) as a bar to this civil suit should be rejected by this Court.

With respect to the merits of Mr. Salter's claims, the district court properly denied summary judgment to defendant on qualified immunity grounds in this §1983 action. Mr. Salter established that the obligation of police under the Due Process Clause to disclose exculpatory evidence was clearly established law prior to 2003, as required to overcome defendant's qualified immunity claim. *Moldowan v. City of Warren*, 578 F.3d 351, 378-382 (6th Cir. 2009). Mr. Salter also established that, for qualified immunity purposes, it was clearly established prior to 2003 that a person police suspected of committing a crime had a constitutional right to be free from unduly suggestive identification procedures. *Gregory v. City of Louisville*, 444 F.3d 725, 745-746 (6th Cir. 2006). The district court's denial of summary judgment on this aspect of Mr. Salter's claims should therefore be affirmed.

While some of defendant's various qualified immunity arguments do raise questions of law that are capable of appellate review at this juncture, defendant also presents some issues of fact that are beyond the scope of this Court's jurisdiction. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). To the extent defendant's arguments drift from the purely legal into the factual realm and begin contesting the facts or the district court's determinations that genuine disputes of material fact exist, this Court lacks jurisdiction to entertain defendant's arguments. *Id.*; *Moldowan*, 578 F.3d at 370.

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews a district court's denial of summary judgment de novo, reviewing facts in the light most favorable to the nonmovant. *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015). Summary judgment is only appropriate if the record shows that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II.    THERE IS NO MERIT TO DEFENDANT'S ARGUMENT THAT DISMISSAL IS PROPER FOR LACK OF SUBJECT MATTER JURISDICTION.

Defendant opens his brief with the novel argument that this Court lacks subject matter jurisdiction over this case and attempts to invoke the doctrine of *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), as a bar to this civil suit. (Defendant's Brief on Appeal, at 21-29). Under the *Heck* doctrine, a §1983 action cannot be maintained if a favorable judgment would impugn the integrity of a conviction that was not already reversed, expunged, invalidated, or overturned:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. §

2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck*, 512 U.S. at 487. Defendant argues that the order vacating Mr. Salter's conviction and sentence is invalid and insufficient to satisfy the "favorable termination" requirement of *Heck* because the order was entered based on a stipulation and not in response to a "motion" filed by either the defendant or the prosecution, purportedly in contravention of the Michigan Court Rules. (Defendant's Brief, at 22-28). Defendant argues that the stipulated order therefore constitutes an "ultra vires" act by the state court that was not expressly or impliedly mandated or authorized by law. (*Id.*, at 29). The defendant's argument is flawed for several reasons.

Defendant's argument is based on the fact that the state trial court issued an order pursuant to stipulation that vacated Mr. Salter's convictions and sentences and dismissed all charges against him. (RE.36-22: Stipulated Order Vacating Convictions, PageID#970-971). The order is signed by the Judge Annette J. Berry, the same judge who presided over Mr. Salter's criminal trial. (*Id.*). Valerie Newman, the Director of the Conviction Integrity Unit in the Wayne County Prosecutor's Office, Carole Stanyar, an assistant Wayne County prosecutor, and two attorneys from the Federal Defender Office, Colleen Fitzharris and Jonathan Epstein, all stipulated to entry of

the order vacating the conviction. (*Id.*).

The order vacating Mr. Salter's conviction has never been reversed, vacated, set aside, or challenged on appeal, nor has any collateral attack on the order ever been mounted by any party in a state forum. It is well established that a federal court must afford the state court's final order of dismissal the same conclusive effect that would be given to it by the state courts. 28 U.S.C. § 1738; *Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015) ("'State-court judgments are given the same preclusive effect under the doctrines of res judicata and collateral estoppel as they would receive in courts of the rendering state.'") (quoting *Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 519 (6th Cir. 2011)). Defendant has not cited any case law supporting his argument that such an order would not be regarded as fully final and given conclusive effect by Michigan courts.

Defendant contends, however, that the state court's order was procedurally deficient and should be disregarded because it was issued based on presentation of a "stipulation" rather than a "motion," in contravention of what defendant claims are the requirements under the Michigan Court Rules. Defendant, however, has not cited any legal authority for the proposition that this Court has any power to review or nullify the final order of a state court invalidating a criminal conviction. To the contrary, it is well settled that federal appellate courts generally have no authority to

entertain appellate review of state court judgments, which is a prerogative exclusively reserved to the Supreme Court of the United States. See *Fowler v. Benson*, 924 F.3d 247, 254 (6th Cir. 2019) (holding that "*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), hold that only the Supreme Court may review judgments entered by state courts in civil litigation."); *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012) (same, citing 28 U.S.C. §1257 and *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005)).

Defendant contends, however, that Judge Berry's order was procedurally deficient and should be disregarded because it was entered in contravention of the requirements under the Michigan Court Rules. Defendant, however, has not offered any legal authority for the proposition that this Court has any power to review or nullify the final order of a state court invalidating a criminal conviction.

Contrary to defendant's argument that the state court's order vacating Mr. Salter's conviction was an "ultra vires" act, the state court entered a valid order vacating Mr. Salter's conviction and dismissing all criminal charges against him. "A state officer may be said to act ultra vires only when he acts without any authority whatever." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 736 (6th Cir. 2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)). "The test

to determine whether a state official has acted ultra vires is whether the state official had a colorable basis for the exercise of authority." *Id*. See also *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949) (holding that an ultra vires claim rests on "the officer's lack of delegated power. A claim of error in the exercise of that power is therefore no sufficient."). It is undisputed that the Michigan Court Rules grant authority to state courts to vacate or set aside a criminal judgment after the conclusion of direct appeal under MCR 6.501, et seq. Defendant does not question the state court's authority to enter such an order, but merely claims an error in the exercise of that authority. The state court's order vacating Mr. Salter's convictions cannot be said to be an "ultra vires act." *Larson*, *supra*.

Even if some procedural error occurred when the conviction was vacated based on a stipulation rather than a "motion," Michigan courts readily recognize the fundamental distinction between errors in the exercise of valid jurisdiction and actions taken in the absence of jurisdiction to act in the first instance. *Buczkowski v. Buczkowski*, 88 N.W.2d 416, 419 (Mich 1958) ("There is a wide difference between a want of jurisdiction in which case the court has no power to adjudicate at all, and a mistake in the exercise of undoubted jurisdiction in which case the action of the trial court is not void although it may be subject to direct attack on appeal. This fundamental distinction runs through all the cases.") (emphasis added). There simply

is no legal ground for this Court to hold that the act of a state trial court of general jurisdiction in vacating its own judgment was done "without any authority whatsoever," based upon procedural missteps that purportedly occurred before entry of the order vacating Mr. Salter's conviction.

In any event, there is no support in the Michigan Court Rules for defendant's position that the order vacating Mr. Salter's conviction was procedurally unsound. MCR 6.501 provides that "[u]nless otherwise specified by these rules, a judgment of conviction and sentence entered by the circuit court not subject to appellate review under subchapters 7.200 or 7.300 may be reviewed only in accordance with the provisions of this subchapter." The commentary to MCR 6.501 indicates that the procedural hurdles established in that chapter of the Michigan Court Rules establish the right *of a defendant* to present a motion for relief from judgment. MCR 6.501 cmt. ("New Subchapter 6.500 establishes a procedure for postappeal proceedings challenging criminal convictions. It provides the exclusive means to challenge convictions in Michigan courts for a defendant who has had an appeal by right or by leave, who has unsuccessfully sought leave to appeal, or who is unable to file an application for leave to appeal to the Court of Appeals because 18 months have elapsed since the judgment."). Nothing in those provisions or elsewhere in the Michigan Rules of Court constrains a state trial court's authority in the first instance

to vacate or set aside its own judgment of conviction upon the initiation of the prosecuting attorney. MCR 6.501 et seq., rather, applies by its plain terms only to a request for relief by a criminal defendant.

Even assuming, however, that MCR 6.502 does not only apply to requests for relief by a criminal defendant, and in fact applies to a request for relief initiated by the prosecuting attorney, the court rule is clear that the trial court had the authority to act upon the stipulation of the attorneys. MCR 6.502(D) specifically provides that a state court may adjudicate even a nonconforming request for relief that is not submitted in the form outlined in the court rules:

> If a motion is not submitted on a form approved by the State Court Administrative Office, or does not substantially comply with the requirements of these rules, the court shall either direct that it be returned to the defendant with a statement of the reasons for its return, along with the appropriate form, *or adjudicate the motion under the provisions of these rules*....

MCR 6.502(D), therefore, authorizes the state court to adjudicate the request for relief, even when presented in a nonconforming manner such as a stipulated order.

On identical facts, other courts uniformly have concluded that any supposed procedural error in the state court's invalidation of its own judgment of conviction is not an obstacle to suit by a plaintiff in a §1983 action. *Ansari v. Jimenez*, No. 20-10719 (E.D. Mich. Oct. 31, 2022) (Order Denying Mot. to Dismiss) (rejecting

defendant's argument that purported procedural defects in the trial court's order vacating the conviction deprives the court of subject matter jurisdiction; "[P]rong two [of the *Heck* rule] is not met because the State court's conviction and sentence of Plaintiff was vacated. And 'lower federal courts possess no power whatever to sit in direct review of [S]tate court decisions.'"); *Smith v. Wayne County*, No. 21-12070 (E.D. Mich. Dec. 19, 2023) (Opinion and Order Granting/Denying Mot. for Summary Judgment) (rejecting argument that court lacks subject matter jurisdiction because the order vacating defendant's conviction was based on a stipulation of the parties rather than in response to a "motion.").

For all of these reasons, defendant's belated jurisdictional argument should be rejected.

### III. THE DISTRICT COURT PROPERLY DENIED SUMMARY JUDGMENT AS TO PLAINTIFF'S CLAIM OF A CONSTITUTIONAL VIOLATION FOR DEFENDANT'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE.

Officer Olsen appeals the district court's denial of qualified immunity with respect to Mr. Salter's assertion that Olsen withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied qualified immunity to Officer Olsen based on evidence that he failed to disclose to the defense a closeup photograph of Earland Collins and that he did not disclose the fact that Mr.

Luster identified Collins as one of the two shooters on August 6, 2003. (RE.44: Opinion and Order, at 30-31, PageID#1087-1088). For the reasons that follow, the district court's opinion denying summary judgment on Mr. Salter's *Brady* claim should be affirmed.

In reviewing a claim for qualified immunity, this Court follows a two-step inquiry. First, the Court must consider whether the plaintiff has asserted a violation of a known constitutional right. Second, the Court must consider whether the constitutional right was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights. *Gregory v. City of Louisville*, 444 F.3d 725, 745 (6th Cir. 2006).

Defendant argues that even a "generalized" police obligation to turn over exculpatory evidence had not been recognized in 2003, and that it was not until this Court's decision in *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009), that the police officer's obligation under *Brady* was clearly established. (Defendant's Brief, at 37-38). Defendant argues that reversal of the district court's decision is proper because Salter cannot establish that the constitutional right was clearly established in 2003. (*Id.*). Defendant's argument, however, is without merit for the precise reasons set forth in this Court's holding in *Moldowan*.

26

In *Moldowan*, the plaintiff filed a §1983 claim alleging a number of violations of his constitutional rights arising out of his 1990-1991 criminal prosecution and conviction, a conviction that was ultimately overturned in 2002. The plaintiff alleged in pertinent part that a City of Warren police detective, Donald Ingles, failed to disclose exculpatory evidence in violation of his constitutional rights. *Moldowan*, 578 F.3d at 376. Detective Ingles appealed the district court's denial of his motion for summary judgment, arguing on appeal that plaintiff "cannot demonstrate that the Due Process Clause imposes on the police a clearly established obligation to disclose exculpatory information." *Id.*, at 377.

This Court confirmed that the due process guarantees recognized in *Brady* as applicable to a prosecutor also imposed "an analogous or derivative obligation on the police" to disclose potentially exculpatory evidence. *Moldowan*, 578 F.3d at 378-381. This Court concluded that, as a practical matter, *Brady*'s ultimate concern for ensuring that criminal defendants receive a "fundamentally fair" trial demands that "*Brady*'s protections also extend to actions of other law enforcement officers such as investigating officers." *Id.*, at 378. But beyond the practical justification for such a finding, this Court held that it is "evident" that the constitutional principles set forth in *Brady* "apply just as equally" to police as to prosecutors, and "thus support our recognizing that the police can commit a constitutional deprivation analogous to that

recognized in *Brady* by withholding or suppressing exculpatory material." *Id.*, at 378-379. The *Moldowan* Court further held that a police officer's obligation to disclose material and exculpatory evidence also follows from the recognized obligation on the police to preserve exculpatory evidence. *Id.*, at 380-381, citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

After determining that such an obligation exists under *Brady*, this Court in *Moldowan* turned to the question of whether that obligation was "clearly established" as of the date of Detective Ingles' alleged violation of that duty in August 1990. This Court noted that decisions from other circuits recognized that this right was clearly established prior to 1990, with some dating back "as far as 1964." *Id.*, at 382. This Court therefore concluded that, "[a]lthough our recognition of this type of a claim is more recent and less specific, the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights." *Id.*

Given this Court's holding in *Moldowan*, the district court properly found that it was clearly established at the time of the events in question that Mr. Salter had a right to not have exculpatory or impeachment evidence withheld from him. (RE.44: Opinion and Order, at 31, n.5, PageID#1088). As held in *Moldowan*, it was well

established long before 2003, when Mr. Salter was prosecuted, that the duty to disclose evidence falls on the state as a whole, and applies to police as well as prosecutors. *Moldowan*, 578 F.3d at 382. See also *Strickler v. Greene*, 527 U.S. 263, 280-281 (1999) (holding that the *Brady* rule "encompasses evidence 'known only to police investigators and not to the prosecutor,'" citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)); *Gillispie v. Miami Twp., Ohio*, 18 F.4th 909, 918 n.2 (6th Cir. 2021) (noting that it has long been clearly established law that prosecutorial withholding of exculpatory evidence violates a criminal defendant's Fourteenth Amendment right to due process, with the obligation to disclose extending to police officers); *Jackson v. City of Cleveland*, 925 F.3d 793, 823-824 (6th Cir. 2019); *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 468 (6th Cir. 2015).

The deposition testimony of Officer Olsen further supports that a police officer's obligation under *Brady* was clearly established in 2003. Although Officer Olsen testified at his deposition that he did not recall showing Mr. Luster the photo array on August 6, 2003, he admitted in the deposition that he provided in this case that if Mr. Luster had identified "E" and another individual as possible shooters based upon the photo array, that information should have been included in the police file and forwarded to the prosecutor. (RE.36-4: Olsen Dep, at 101-108, PageID#758). Additionally, even though Officer Olsen did not know where the closeup photograph

of Collins came from or how it ended up in his file, he also admitted that the photograph "should have been turned over" to the prosecutor. (*Id.*, at 95, PageID#755). Given this testimony, the district court's finding that it was clearly established could properly conclude that, at the time of the events here, Mr. Salter had a right to have exculpatory/impeachment evidence made available to him. (RE.44: Opinion and Order, at 31 n.5, PageID#1088).

There also is no merit to Office Olsen's suggestion that Mr. Salter must demonstrate "bad faith" to establish that withholding evidence violated his due process rights. (Defendant's Brief, at 39). This Court in *Moldowan* specifically held that a showing a bad faith is *not* required where the police fail to disclose evidence that they know or should know is material and exculpatory:

> The central lesson of all of these cases is that the critical factor in determining whether the state's obligation is "absolute" turns on the nature of the evidence at issue, not who destroyed or suppressed the evidence. The justification for imposing an absolute duty where material and exculpatory evidence is at issue is clear enough: the failure to preserve or disclose such evidence directly threatens the "fundamental fairness" of a defendant's criminal trial. See *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333; *Trombetta*, 467 U.S. at 485, 104 S.Ct. 2528; *Lisenba*, 314 U.S. at 236, 62 S.Ct. 280. Because that concern for fundamental fairness is just as strong where a defendant claims that the police destroyed or suppressed material evidence, see *Branch*, 537 F.3d at 589, there is no constitutionally-supportable basis for applying a different standard and requiring courts to inquire into the mental state of the police.
>
> The only difference in the requisite inquiry is that, where the police are

concerned, the "exculpatory value" of the evidence must be "apparent." *Trombetta*, 467 U.S. at 489, 104 S.Ct. 2528. This additional burden, however, merely reflects that materiality is a legal question that the police are not trained to make, and thereby accounts for the practical concern that the police cannot be held accountable for failing to divine the materiality of every possible scrap of evidence. See *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333. It does not imply, however, that the police are entirely shielded from liability unless a defendant shows "bad faith." Where the exculpatory value of a piece of evidence is "apparent," the police have an unwavering constitutional duty to preserve and ultimately disclose that evidence. The failure to fulfill that obligation constitutes a due process violation, regardless of the whether a criminal defendant or § 1983 plaintiff can show that the evidence was destroyed or concealed in "bad faith." The reason no further showing of animus or bad faith is required is that, where the police have in their possession evidence that they know or should know "might be expected to play a significant role in the suspect's defense," *Trombetta*, 467 U.S. at 488, 104 S.Ct. 2528, the destruction or concealment of that evidence can never be done "in good faith and in accord with their normal practice," *Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961). Consequently, requiring a criminal defendant or § 1983 plaintiff to show a "conscious" or "calculated" effort to suppress such evidence would be superfluous.

*Moldowan*, 578 F.3d at 387-389 (footnotes excluded). For all of these reasons, the district court properly concluded that the obligation of police to disclose exculpatory evidence was clearly established in 2003.

Officer Olsen also argues that Mr. Salter failed to demonstrate clearly established law holding that, "in the particular circumstances" here, a police offer's failure to disclose a purportedly "duplicative" photograph of a person already known to the criminal defendant violates *Brady*. (Defendant's Brief, at 36, 40-41). There are

several problems with this aspect of the defendant's argument.

First, and most importantly, defendant's argument in this regard – that Mr. Salter's *Brady* violation claim is predicated solely upon a failure to disclose a "duplicative" photograph of Mr. Collins – is based upon a purported fact that is disputed by the parties and not supported by the record below. It is well established that a defendant who is denied qualified immunity may file an interlocutory appeal with this Court "only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6ᵗʰ Cir. 1998). A district court's determination that there exists a triable issue of fact cannot be appealed on an interlocutory basis, even when that finding arises in the context of an assertion of qualified immunity. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). To the extent that an appellant in an interlocutory appeal argues issues of fact and law on appeal, this Court will only entertain pure issues of law. *Gregory*, 444 F.3d at 742-743.

It is well established that "to bring an interlocutory appeal of a qualified immunity ruling, the defendant must be willing to concede the plaintiff's version of the facts for purposes of the appeal." *Gillispie v. Miami Township, Ohio*, 18 F.4d 909, 917 (6ᵗʰ Cir. 2021). As held in *Gillispie*, this Court has consistently enforced the jurisdictional bar established in *Johnson* in cases where the defendant's qualified

immunity appeal is based solely upon a disagreement with the plaintiff's facts. *Id.*, at 916. If disputed factual issues are "crucial" to a defendant's interlocutory qualified immunity appeal, this Court is obliged to dismiss the appeal for lack of jurisdiction. *Id.* Even in circumstances where a defendant asserts arguments about whether the law was clearly established, if he "fails to concede the most favorable view of the facts," this Court cannot consider those arguments. *Id.*, at 917.

In *Gillispie*, the defendant refused to accept the plaintiff's version of the facts and disagreed with the district court's determinations that multiple genuine disputes of material fact existed. *Id.*, at 918. This Court noted that the factual disputes raised by the defendant served as the sole bases for his arguments about clearly established law, and were "crucial" to the defendant's contentions that, because the district court erred in finding certain facts, the law was not clearly established. This Court held in *Gillispie* that the defendant's failure to accept plaintiff's version of the facts was "fatal" to his appeal. *Id.*

Similarly here, Officer Olsen's version of the facts outlined in his brief on appeal – indicating that the *Brady* violation only involved a failure to disclose a "duplicate" photograph of Mr. Collins – differs significantly from the facts established in the district court. Most importantly, defendant's argument ignores the important fact that, as held by the district court, the *Brady* violation that was

33

established here does not simply involve the failure to turn over to the defense a closeup photograph of Collins. (RE.44: Opinion and Order, at 30-31, PageID#1087-1088). The evidence presented below established that Officer Olsen not only did not turn over the closeup photograph of Collins, but he also did not disclose the fact that, as testified to by Mr. Luster at his deposition, Mr. Luster *specifically identified Collins as one of the shooters* on the day of the shooting. (*Id.*; RE.36-7: Luster Dep, at 37-38, 79-80, PageID#786, 796). As held by the district court, the evidence presented below established that Mr. Salter "did not have either the larger photo of Collins or the important context provided by Luster's testimony - that he did identify Collins as one of the shooters from the photo array." (RE.44: Opinion and Order, at 30, PageID#1087). As properly held by the district court, these facts "point directly to Collins being the taller shooter with the rifle instead of Salter." (*Id.*).

There also is no factual support for Officer Olsen's contention that the closeup photograph of Collins is "duplicative" of another photograph of Collins included in the photo array. The closeup photograph of Mr. Collins that was not turned over to Mr. Salter more clearly depicts Collins, who is looking straight into the camera, than the photograph of Collins that was included in the photo array shown to Mr. Luster on August 6, 2003. (RE.36-10: Photo Array, PageID#833; RE.36-13: Closeup Photograph of Collins, PageID#910). In the photo array that was shown to Mr.

Luster, Collins is looking down and his eyes cannot be seen. (RE.36-10: Photo Array, PageID#833).

Mr. Salter presented evidence that the differences between these two photographs were important. In response to the summary judgment motion filed in this case, Lyle Harris, Mr. Salter's criminal defense attorney, signed an affidavit in which he indicated that, had he been provided the closeup photograph of Collins, he could have used the photograph to cross-examine both Mr. Luster and Officer Olsen during trial. (RE.36-15: Lyle Affidavit, PageID#914). Mr. Harris further indicated that, had Mr. Luster identified Collins as one of the shooters based upon the closeup photograph, "I believe it would have created reasonable doubt in the jurors' minds," particularly because Collins was 6'2" and 200 pounds, "a lot closer to the description of the second shooter" that was provided by Mr. Luster than Mr. Salter, who was 6'4" and 250 pounds. (*Id.*). Mr. Luster also submitted an affidavit in which he attested that, had he been shown the closeup photograph of Earland Collins, he would have identified Earland Collins as "the taller shooter with a rifle." (RE.36-25: Luster Affidavit, ¶¶14, PageID#1002).

Mr. Harris further stated in his affidavit that, having the closeup photograph of Collins at trial, "showed that the police had considered Earland Collins as a suspect." (RE.36-15: Lyle Affidavit, PageID#914). With this information, Mr. Harris

would have been in a better position to tie Collins to the drug activity in the neighborhood and with the individuals who were shot, and he could have cross-examined Officer Olsen regarding how he ruled out Collins as a suspect while focusing instead on Mr. Salter. (*Id.*). As attested to by Mr. Harris, "[h]aving the photo of a stronger suspect in the detective's files would have called into question the integrity of the homicide investigation in this case." (*Id.*).

The district court correctly recognized in its decision denying summary judgment that this evidence created a question of fact for the jury as to whether Officer Olsen withheld evidence that was material to the defense. (RE.44: Opinion and Order, at 30-31, PageID#1087-1088).

By arguing that the evidence establishes at most a failure to disclose a "duplicate" copy of a photograph, however, defendant is apparently unwilling to accept Mr. Salter's version of the facts or the facts as found by the district court. These factual disputes are "crucial" to Officer Olsen's contentions that the law was not clearly established in 2003 that a police officer was obligated to turn over a "duplicative" photo of a possible suspect already known to the defendant. This Court cannot entertain defendant's arguments going to disputed issues of material fact in this interlocutory appeal. *Johnson*, *supra*; *Gillispie*, *supra*.

Assuming this Court solely entertains the "pure issues of law" regarding

whether the facts as established by the record below constitute a violation of clearly established law, *Berryman*, *supra*, defendant "cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional...rights." *Gregory*, 444 F.3d at 744, citing *Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999). Contrary to defendant's argument on appeal, the evidence established that it was "clearly established" in 2003 that a police officer had to turn over this information to the prosecutor. *Moldowan*, *supra*. In fact, as noted above, Officer Olsen admitted at his deposition that this information should have been turned over to the prosecutor because it would have helped the defense. (RE.36-4: Olsen Dep, at 95, 101-108, PageID#755, 758). The district court therefore properly concluded that Mr. Salter's *Brady* claim must be submitted to a jury for resolution.

Finally, defendant's argument that the district court was "wrong" to infer that the closeup photograph had not been turned over to the prosecutor or the defense similarly should not be reviewed by this Court in this interlocutory appeal. *Johnson*, *supra*; *Gillispie*, *supra*. (Defendant's Brief, at 44-45). While this Court may, in exceptional circumstances, decide an appeal challenging the district court's factual determination if that determination is "blatantly contradicted by the record, so that no reasonable jury could believe it," *Gillispie*, 18 F.4th at 916, this appeal does not

present such a situation.

As noted by the district court, Mr. Salter presented evidence that the closeup photograph of Mr. Collins was not provided to the trial prosecutor or the defense. Colleen Fitzharris, one of Mr. Salter's attorneys from the Federal Defender Office, obtained Lyle Harris' file as part of her appellate investigation and testified via affidavit that the photograph of Collins was not part of that file. (RE.36-17: Fitzharris Affidavit, ¶¶3, 6, PageID#927). Moreover, the trial prosecutor, Lisa Lindsey, confirmed at her deposition that, had the closeup photograph of Collins been disclosed by the police, she would have turned that photograph over to the defense. (RE.36-16: Lindsay Dep, 27-28, PageID#924). Additionally, the district court properly inferred from the affidavit signed by Mr. Harris that he was not provided with the closeup photograph of Collins during Mr. Salter's criminal proceedings. (RE.36-15: Harris Affidavit, PageID#914; RE.44: Opinion and Order, at 28, PageID#1085).

Based upon this evidence, the district court properly held that a jury could "reasonably infer" that the closeup photograph of Collins found in Officer Olsen's file was not provided to the trial prosecutor or the defense. (RE.44: Opinion and Order, at 28, PageID#1085). Contrary to defendant's argument, the district court's determination that the closeup photograph of Collins had not been turned over to the

prosecutor or the defense was not "utterly discredited" by the evidence. The district court's opinion should be affirmed.

**IV. THE DISTRICT COURT PROPERLY DENIED SUMMARY JUDGMENT AS TO PLAINTIFF'S CLAIM OF A CONSTITUTIONAL VIOLATION FOR DEFENDANT'S UNNECESSARILY SUGGESTIVE SINGLE-PHOTO IDENTIFICATION PROCEDURE.**

Officer Olsen also appeals the district court's denial of qualified immunity with respect to Mr. Salter's claim that the defendant used an unduly suggestive single-photo identification procedure in getting Mr. Luster to identify Mr. Salter as one of the shooters. The district court denied qualified immunity to Officer Olsen based upon evidence that he used an unduly suggestive single-photograph identification procedure in getting Mr. Luster to identify Mr. Salter. (RE.44: Opinion and Order, at 40-41, PageID#1097-1098). This Court should affirm the district court's opinion for the reasons that follow.

As set forth above, in reviewing a claim for qualified immunity, this Court must first consider whether the plaintiff has asserted the violation of a constitutional right. Second, the Court must consider whether the constitutional right was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights. *Gregory*, 444 F.3d at 745.

Here, Mr. Salter asserted a violation of a known constitutional right. He alleged that Officer Olsen violated his right to due process and a fair trial as a result of his use of an unduly suggestive single-photo identification process. It is well established that a criminal suspect has a constitutional right to be free from identification procedures "so unnecessarily suggestive and conducive to irreparable mistaken identification" that the identification's use violates due process of law. *Gregory*, 444 F.3d at 746, citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967), abrogated on other grounds by *United States v. Johnson*, 457 U.S. 537 (1982); *Perry v. New Hampshire*, 565 U.S. 228, 238-239 (2012) (holding that a suggestive identification procedure violates due process when law enforcement officers use an identification procedure that is both suggestive and unnecessary.). The district court therefore properly found that Officer Olsen violated a known constitutional right.

The district court also properly concluded that the right to be free from suggestive identification procedures was well established in 2003. (RE.44: Opinion and Order, at 41-44, PageID#1098-1101). This Court in *Gregory* specifically rejected a defendant's argument that there was no well established constitutional right in 1992 to be free of impermissibly suggestive identification procedures. *Gregory*, 444 F.3d at 745-746; see also *Gillispie*, 18 F.4th at 918, n.2 (noting that, as early as 1967, it was clearly established that a person the police suspected of committing a crime had

a constitutional right to be free from identification procedures "so unnecessarily suggestive and conducive to irreparable mistaken identification" that the identification's use violates due process of law.).

As recognized by the district court, courts have found that single-photo identifications are unnecessarily suggestive. (RE.44: Opinion and Order, at 41, PageID#1098). In *Stovall*, 388 U.S. at 302, the Supreme Court held that the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." See also *Simmons v. U.S.*, 390 U.S. 377, 383-384 (1968) (holding that the danger that a witness may make an incorrect identification is increased if the police show the witness "only the picture of a single individual who generally resembles the person he saw.").

As noted by the district court, the holding in *Stovall* is consistent with the Detroit Police Department's own policies in 2003, which provided that "[w]itnesses should never be shown only a photograph of the suspect." (RE.36-20: DPD Policy 203.11, PageID#935). While Officer Olsen's violation of the department policy on its own did not rise to the level of a constitutional violation, the district court properly relied on case law holding that a department's policy may provide additional evidence – along with then-existing precedent – that officers violated established law. (RE.44: Opinion and Order, at 41-42, PageID#1098-1099), citing *Martin v. City of Broadview*

*Heights*, 712 F.3d 951, 962 (6th Cir. 2013). The district court therefore properly held that a reasonable Detroit Police Department officer would be on notice that a single-photo identification is "problematic" and violates clearly established law based upon the Department policy. (RE.44: Opinion and Order, at 41-42, PageID#1098-1099).

Officer Olsen also argues on appeal that it was not "clearly established" in 2003 that the single-photo identification procedure used here violated Mr. Salter's constitutional rights because Mr. Luster's identification of Mr. Salter was merely a "confirmatory identification." (Defendant's Brief, at 47). Defendant's argument, again, is both legally and factually inaccurate. To the extent that the defendant contests the district court's determination that a question of fact exists as to whether the single-photo identification procedure used by Officer Olsen was reasonable under the circumstances, this Court does not have jurisdiction to address this issue. *Johnson*, *supra*, 515 U.S. at 313, 320 (holding that a defendant may not appeal a district court's order denying a claim of qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial.").

Even if this Court were to entertain the "pure issue of law" regarding whether the facts as established by the record below constitute a violation of clearly established law, the district court's conclusion that a reasonable officer in 2003 would

be on notice that the identification procedure utilized here would be unconstitutional should be affirmed. (RE.44: Opinion and Order, at 43-44, PageID#1100-1101). In *Gregory*, this Court held that "this Court has never found that an identification arising from a suggestive format was anything but *unreliable* when the witness' prior description of the suspect was significantly inconsistent with the suspect's actual appearance." *Gregory*, 444 F.3d at 756 (emphasis in original).

Here, as held by the district court, Mr. Luster's description of the shooter "Rob" was significantly inconsistent with Mr. Salter's actual appearance. Mr. Luster described "Rob" as 5'7" and 150 to 170 pounds. (RE.36-2: Luster/Olsen Statement, PageID#724). But, based solely upon what he described as an unexplained "hunch," and after "doing some research at the precinct," Officer Olsen presented Mr. Luster with a single photograph of Mr. Salter and asked if the person depicted in the photograph was "Rob."(RE.36-5: Olsen Preliminary Exam, at 29-30, PageID#771-772; RE.36-6: Luster Statement, PageID#774). Mr. Salter, however is 6'4" tall and weighs approximately 250 pounds, and therefore did not at all match the suspect's description.

Although Officer Olsen testified at his deposition that he believed that Mr. Salter was the shooter Mr. Luster identified as "Rob" at the time he showed Mr. Salter's photograph to Mr. Luster, Officer Olsen testified that he did not know at that

time that Mr. Salter was 6'4" and 250 pounds at that time. (RE.36-4: Olsen Dep, at 77-80, 85, 123, PageID#751, 753, 762). Evidence presented below, however, established that the Detroit Police Department software system in use in 2003 provided an individual's height and weight. (RE.36-8: Fennessey Dep, at 7-10, PageID#804-805). Officer Olsen also conceded that if he had known Mr. Salter's height and weight, he would not have shown Mr. Salter's photograph to Mr. Luster because "that doesn't match. He's way too big." (*Id*., at 85-86, PageID#753). In fact, Officer Olsen admitted that no reasonable officer would have shown Mr. Salter's photograph to Mr. Luster if the officer knew Mr. Salter was 6'4" and 250 pounds. (*Id.*, at 123, PageID#762). Mr. Luster also confirmed that if he had known that Mr. Salter was 6'4" and 250 pounds when he was shown the photograph, he would not have picked him as "Rob" because "he don't fit the description." (RE.36-7: Luster Dep, at 42-43, PageID#787, 792-793).

Given these facts, there is no basis for defendant's argument that Mr. Luster's identification of Mr. Salter was merely a "confirmatory identification." Nor is there any legitimate legal basis for defendant's contention that a reasonable investigator would not know that such actions – showing the photograph of a suspect whose actual appearance is significantly inconsistent with the witness' prior description of the suspect – were inappropriate and in violation of an individual's constitutional

rights. *Gregory*, 444 F.3d at 745-746. This Court should affirm the district court's finding that a reasonable officer in 2003 would be on notice that the use of a single-photo identification procedure, given the significant discrepancy between the witness's description of the suspect and Mr. Salter, would be unconstitutional. (RE.44: Opinion and Order, at 43-44, PageID#1100-1101).

Not only did the evidence establish that Mr. Salter's description was significantly inconsistent with Mr. Luster's description of the suspect, but Mr. Luster's deposition testimony established that he identified Mr. Salter only after Officer Olsen advised Luster that the police had already detained someone in connection with the shooting. As held by the Supreme Court in *Simmons v. U.S.*, 390 U.S. at 383-384, the chance of misidentification of a suspect is increased "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."

Here, Mr. Luster testified at his deposition that when Officer Olsen came to his house the morning of the shooting, Officer Olsen told him that the police had already "picked up a guy on that street with a rifle" in connection with the shooting. (RE.36-7: Luster Dep, at 90-91, PageID#799). After Officer Olsen advised Mr. Luster that they had already taken someone into custody in connection with the shooting, Officer Olsen showed Mr. Luster the photograph of Mr. Salter and ask him to confirm if the

photograph was the same person who shot at him. (*Id.*). Mr. Luster thereafter identified Mr. Salter as "Rob" and informed Officer Olsen that Mr. Salter "looked like the guy" who was shooting at him. (*Id.*, at 36-38, PageID#785-786).

Because the evidence supports a finding that Officer Olsen utilized an unduly suggestive identification procedure, and a reasonable officer in 2003 would be on notice that the use of such an identification procedures was unconstitutional, the district court properly concluded that Officer Olsen is not entitled to qualified immunity.

Finally, there is no merit to defendant's argument that Mr. Salter somehow waived his claim or is otherwise collaterally estopped from arguing that the single-photo identification procedure was unduly suggestive based upon state court rulings affirming that Mr. Luster's identification of Mr. Salter was constitutional. (Defendant's Brief, at 47-53). As recognized by the district court, in Michigan, collateral estoppel applies when: (1) an issue has been actually litigated and determined by a valid and final judgment; (2) the same parties have had a full and fair opportunity to litigate the issue; and (3) there is mutuality of estoppel. *Peterson v. Hermes*, 931 F.3d 546, 554 (6th Cir. 2019).

The district court held here that, consistent with this Court's decision in *Peterson*, the state court's ruing on the constitutionality of the identification

procedure used by Officer Olsen does not have preclusive effect because Mr. Salter's criminal conviction was vacated. (RE.44: Opinion and Order, at 34-35, PageID#1091-1092). In *Peterson*, the plaintiff brought a §1983 claim after his conviction for murder and rape was vacated based on new DNA test results, alleging in part that the defendants coerced a confession. The defendants argued that the plaintiff was collaterally estopped from relitigating the voluntariness of his confession. This Court held that because the criminal judgment had been vacated, the state court's interlocutory rulings "have been vacated too." *Peterson*, at 554. This Court further confirmed that "vacated rulings have no preclusive effect under Michigan law," and therefore concluded that there was no "valid and final judgment" that precluded the plaintiff from litigating his claims. *Id.*, at 554-555. This Court noted that its approach is consistent with its holding in *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985), wherein this Court held that a vacated judgment "technically leav[es] nothing to which we may accord preclusive effect." *Id.*

Here, like the defendant in *Peterson*, Officer Olsen similarly argues that the state court ruled that Mr. Luster's identification of Mr. Salter was constitutional during Mr. Salter's criminal proceedings, which should be given preclusive effect. Defendant relies upon *Hatchett v. City of Detroit*, 495 F.Appx 567 (6th Cir. 2012) for his argument that Mr. Salter is collaterally estopped from relitigating the

constitutionality of the identification procedure in his §1983 claim.

Like the plaintiff in *Peterson*, however, Mr. Salter's criminal conviction was vacated and all criminal charges against him were dismissed. (RE.36-22: Stipulated Order Vacating Convictions, PageID#970-971). As in *Peterson*, there is no "valid and final judgment" that precludes Mr. Salter from litigating his claims. And as recognized by this Court in *Peterson*, *Hatchett* is an unpublished decision in which it was not clear that the criminal judgment had actually been vacated. The district court's conclusion that it was bound by this Court's decision in *Peterson*, and its determination that the state court's ruling on the constitutionality of the identification procedure used by Officer Olsen does not have preclusive effect because Mr. Salter's conviction was vacated, should be affirmed.

## CONCLUSION

Based on the foregoing, this Court should affirm the district court's June 2, 2022 decision denying summary judgment to the defendant as to Mr. Salter's constitutional claims of failure to provide exculpatory evidence and improper use of unduly suggestive identification procedures, and remand this matter to the district court for further proceedings.

**MARK GRANZOTTO, P.C.**

__/s/ Mark Granzotto_____

**MARK GRANZOTTO  (P31492)**
Attorney for Plaintiff-Appellee
2684 Eleven Mile Road, Suite 100
Berkley, Michigan 48072
(248) 546-4649

Dated: February 9, 2024.

## CERTIFICATION PURSUANT TO FRAP 32(a)(7)(C)

Mark Granzotto, attorney for plaintiff-appellee, hereby certifies pursuant to

Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure that this brief was typed

using the Corel Word Perfect word processing program. That program has a function

which can calculate the total number of words contained in a document. According

to that program function, there are 11,525 words in this brief.

       /s/  Mark Granzotto
       Counsel for Plaintiff-Appellee

## DESIGNATION OF RECORD ON APPEAL

Pursuant to Sixth Circuit Rule 29(c), plaintiff-appellee designates the following additional filings in the district court for inclusion in the Record on Appeal:

| **Description Of Entry** | **Date Filed** | **RE No.** | **Range** |
|---|---|---|---|
| Response to Motion for Summary judgment (w/Exhibits) | 4/17/20 | 36 | 667-1007 |
| Reply Brief | 4/27/20 | 37 | 1008-1017 |
| Tr. Dated December 16, 2020 | 9/16/22 | 54 | 1465-1488 |

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2024, I electronically filed the foregoing paper with the Clerk of the United States Sixth Circuit Court of Appeals, using the ECF system.

_/s/  Mark Granzotto_____